UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CRIME, JUSTICE & AMERICA, INC.,
a California Corporation; and
RAY HRDLICKA, an individual,

        Plaintiffs,

    v.

JOHN McGINNESS, in his official
capacity of Sheriff of the
County of Sacramento,
California,

        Defendants.
_____/

NO. CIV. 08-cv-00394 FCD EFB

MEMORANDUM & ORDER

----oo0oo----

This matter is before the court on defendant John McGinness' ("defendant" or "McGinness") motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs Crime, Justice & America, Inc. and Ray Hrdlicka ("Hrdilicka")

(collectively "plaintiffs") oppose the motion.[1]  For the reasons set forth below,[2] defendant's motion for summary judgment is GRANTED.

## BACKGROUND[3]

Plaintiffs filed this action, arising out of the policies of the Sacramento County Jail in its distribution of plaintiffs' magazine, *Crime, Justice & America* ("*CJA*"). (Compl., filed Feb 22, 2008.) Plaintiffs assert that defendant's policies violate their Constitutional rights guaranteed by the First Amendment be denying distribution of *CJA* whether directly mailed to inmates or dropped off for bulk distribution. (Compl. ¶¶ 31-37.) Plaintiff Crime, Justice & America, Inc. is a private company with the primary business purpose of publishing and distributing the

---

[1] Plaintiffs previously filed a motion to continue defendant's motion for summary judgement pursuant to Rule 56(f) and a motion to modify the scheduling order to reopen discovery pursuant to Rule 16. The court granted the motion.

[2] Because oral argument will not be of material assistance, the court orders the matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

[3] Unless otherwise noted the facts herein are undisputed. (See Undisputed Material Facts in Support of Summ. J. ("DUF"), filed Apr. 14, 2009; Undisputed Material Facts in Opp'n to Summ. J. ("PUF"), filed July 10, 2009).

While plaintiffs filed their own statement of undisputed facts, they failed to respond to defendant's statement.  However, the court will look to the underlying evidence to determine whether there is an actual dispute of fact.

Moreover, the court notes that plaintiffs have failed to comply with numerous local rules and court orders relating to a filing of a Statement of Undisputed Facts rather than a Statement of Disputed Facts, citation to the record in their Statement of Undisputed Facts, and vastly exceeding the court's page limitations without request or approval.  However, in the interest of justice, the court nevertheless considers all the materials filed by plaintiffs.

quarterly periodical *CJA*. (Compl. ¶ 6.) Plaintiff Hrdlicka is the sole owner and the publisher of CJA. (Compl. ¶ 7; PUF ¶ 1.) Defendant McGinness is the Sheriff of the County of Sacramento at all relevant times. (Compl. ¶ 8.)

The Sheriff is in charge of managing the Sacramento County Jail (the "Jail"). (DUF ¶ 1.) On average, there are 2,340 inmates at the Jail per day. (DUF ¶ 2.) There are over seven hundred pieces of incoming mail and six hundred pieces of outgoing mail per day. (DUF ¶ 5.) In accordance with applicable regulations, defendant implemented policies and procedures relating to the receipt of mail for inmates in the jail. (DUF ¶ 3.)

The mail at the Jail is processed during the night shift six days a week by a total of sixty persons. (DUF ¶¶ 7, 13.) Control room officers are responsible for opening and inspecting the mail, and floor officers distribute the mail. (DUF ¶ 8.) Commercial publications and personal mail are reviewed for content and searched for contraband prior to distribution. (DUF ¶ 9.) A total of twenty-four personnel hours is used per day on mail related duties at the Jail. (DUF ¶ 12.)

The mail policy currently in place at the Jail prohibits the distribution of unsolicited commercial mail. (DUF ¶ 15.) The policy does not take into account the content of any unsolicited publications, nor the postage rate under which unsolicited publications are sent. (DUF ¶ 16.) The Jail will not accept publications for distribution received on a "drop-off" basis or delivery that constitutes "bulk delivery." (DUF ¶ 17.) The Jail considers "bulk mail" to be any mail, regardless of volume not

3

individually addressed and not individually posted with U.S. Postage. (PUF ¶ 81.) Defendant contends that the primary purpose of the refusal to accept and distribute unsolicited commercial mail is to allow the Sheriff to control the volume of mail that enters the Jail, which allows for control over the amount of time and resources used to categorize, effectively search, and distribute incoming mail. (DUF ¶ 18; see PUF ¶ 54 ("Sacramento County Jail denies distribution of bulk mail for two reasons: (1) the precedential value of potentially having to accept other deliveries of bulk mail; and (2) the potential negative effect on the work load for the Jail staff."))

Further, inmates are only allowed to keep a limited amount of written materials in their cells and are not permitted to leave any materials in the common areas of the jail. (DUF ¶ 23.) Moreover, the Sheriff is required to maintain the Jail in a neat, orderly manner, and all places not open to continuous observation must be kept free from combustible litter and rubbish at all times. (DUF ¶ 22.) The purported purpose of these rules and requirements are to: (1) limit inmates' ability to secret contraband; (2) limit the amount of materials that inmates can use to plug toilets and flood their cells and pods; (3) limit inmates' ability to place items over the lights and windows in their cells, allowing staff to perform mandated hourly welfare checks more efficiently; and (4) enhance inmate safety by providing fewer avenues in which they can communicate inappropriate and violent messages and instructions to each other. (DUF ¶ 24.) Even with the various rules already in place, inmates routinely attempt to hide contraband, start fires,

4

flood their cells, and cover their lights and windows.  (DUF ¶ 26.)  Further, Jail staff spend a significant amount of time searching for contraband and attempting to prevent disruptive and dangerous incidents.  (DUF ¶ 27.)

The Jail has multiple common areas, also known as Day Rooms, which contain telephones, televisions, and bulletin boards with advertising.  (DUF ¶ 28.)  There are no materials which are made available to inmates by placing copies in any of the day rooms; this prevents inmates from exchanging messages with each other and limits fire and other safety hazards.  (DUF ¶ 34.)  Defendant asserts that if the Jail were to place bulk copies of *CJA* in the common areas, additional staff and resources would be required to monitor the copies of the publication, remove and replace the publication on a daily basis, and clean up an trash or excess created by the placement of the publication.  (DUF ¶ 35.)

Inmates at the Jail are provided with access to a law library and a general circulation library.  (DUF ¶ 36.)  Inmates can also receive magazines that they subscribe to, if nothing precludes delivery of the particular magazine on the basis of subject matter (e.g., pornography).  (DUF ¶ 40.)

*CJA* is currently distributed in correctional facilities in more than sixty counties throughout thirteen states.  (PUF ¶ 16.)  It is generally distributed to inmates of correctional facilities in one of two manners: (1) direct mailings to inmates; or (2) general distribution.  (PUF ¶ 18.)  In the case of direct mailing, *CJA* is sent, individually addressed, through the U.S. Mail to inmates at a correctional facility at a ratio of approximately one issue for every ten inmates.  (PUF ¶ 19.)  In

5

the case of general distribution, plaintiffs drop off a weekly distribution of *CJA* at a ratio of approximately one issue for every ten inmates, and the jail staff leaves a small stack of magazines in common areas. (PUF ¶ 26.)

Sometime in September 2003, plaintiffs inquired with the Sheriff whether he would be amenable to allow inmates at the Jail to receive *CJA*. (DUF ¶ 41.) On September 30, 2003, plaintiffs were informed by Sheriff Lou Blanas, Sacramento County Sheriff at the time, via Sergeant Scott Jones ("Jones"), that so long as the material and content of the magazine did not fall within prohibited guidelines for inmate mail, they were free to mail the publication to any inmates within the jail facilities. (DUF ¶ 42.) Jones also informed plaintiffs that a list of each inmate housed at the Jail, along with their identifying criteria for receiving mail, was made available to the public on a daily basis in the lobby. (DUF ¶ 43.) However, Jones told Hrdlicka that the Jail would not facilitate the publication's delivery to inmates on a "drop-off" basis. (DUF ¶ 44; PUF ¶ 35.)

On January 6, 2004, Jones again wrote plaintiffs and informed them that the Jail would not accept the publication delivered *en masse*, but that plaintiffs could mail the magazine to individual inmates. (DUF ¶ 45.) Over the next few months, plaintiffs requested a weekly electronic copy of the list of inmate names and housing information or, in the alternative, a paper-based copy. (DUF ¶¶ 46-48.) On May 21, 2004, Jones reiterated that a printed list of inmates and relevant information was available in the lobby of the Jail, but that he was not required to send or mail a copy of the list to plaintiffs

6

1  and would not undertake such a duty.  (DUF ¶ 49.)  On April 5,
2  2005, Jones responded to another request for electronic records,
3  informing plaintiffs that the information sought did not exist in
4  electronic format that could be provided, but that a printed list
5  was available in the lobby.  (DUF ¶ 50.)  At some point prior to
6  January 2007, the technology at the Jail was upgraded and an
7  electronic list became available.  (DUF ¶ 57.)  After this time,
8  an electronic copy of the information was provided to plaintiffs.
9  (DUF ¶ 57.)

10      Plaintiffs were notified on multiple occasions that *CJA*
11 could be mailed directly to inmates without objections.  (DUF ¶
12 55.)  In approximately December 2004, plaintiffs began sending
13 copies of *CJA* to inmates at the Jail through bulk-mail.  (PUF ¶¶
14 43-45.)  Plaintiffs contend that the copies were paid for
15 individually and were addressed to an individual inmate; however,
16 postage was paid at the bulk rate of 14.7 cents per magazine as
17 opposed to individually stamped copies that would have cost $1.21
18 per magazine.  (PUF ¶ 45.)  Plaintiffs sent hundreds of copies of
19 their publication to the Jail on this bulk-mail basis.  (DUF ¶
20 51.)  In May 2005, *CJA* was denied further distribution in the
21 Jail through bulk-mail because of the perceived extra burden on
22 the jail staff.  (PUF ¶ 77.)  Plaintiffs also concede that the
23 distribution of *CJA* in the Jail is a concern because of the
24 introduction of written materials into the Jail over which
25 inmates do not have ownership.  (PUF ¶ 86.)

**STANDARD**

27    The Federal Rules of Civil Procedure provide for summary
28 judgment where "the pleadings, the discovery and disclosure

7

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998). The evidence must be viewed in the light most favorable to the nonmoving party. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. See Nissan Fire & Marine, 210 F.3d at 1107. Instead, through admissible evidence the nonmoving party

"must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## ANALYSIS

Through this action, plaintiffs contend that they have a First Amendment right to distribute *CJA* in the Sacramento County Jail because defendant does not have any legitimate penological interests that are served by the current mail procedures relating to the distribution of magazines. Defendant moves for summary judgment on the basis that his refusal to distribute *CJA* in the manner advanced by plaintiffs is rationally related to the jails' legitimate penological interest.[4]

"In a prison context, an inmate does not retain those First Amendment rights that are 'inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 129 (1977) (quoting Pell v. Procunier, 417 U.S. 817, 822 (1974)). Specifically, "there is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." Thornburgh v. Abbott, 490 U.S. 401, 408 (1989). However, this

---

[4] Defendant also asserts that plaintiffs have no First Amendment right to distribute their unsolicited publication to inmates. Assuming *arguendo* that plaintiffs have such a right, as set forth *infra*, defendant's policies are constitutional pursuant to Turner v. Safley, 482 U.S. 78, 89-90 (1987). As such, the court does not reach this issue. See United States v. Kaluna, 192 F.3d 1188, 1197 (9th Cir. 1999) (quoting Jean v. Nelson, 472 U.S. 846, 854 (1985) ("[A] fundamental rule of judicial restraint" is that "courts are 'not to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.'")).

9

right "is subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security." Prison Legal News v. Lehman, 397 F.3d 692, 699 (9th Cir. 2005). Indeed, the Supreme Court has "repeatedly recognized the need for major restrictions on a prisoner's rights" in balancing the institutional needs and objectives of prisons and rights generally afforded by the Constitution. Id.

In Turner v. Safley, the Supreme Court laid out a four-factor test to determine whether a prison regulation that impinges upon First Amendment rights is "reasonably related to legitimate penological interests":

> (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

Prison Legal News, 397 F.3d at 699 (quotations and citations omitted); see Turner, 482 U.S. 78, 89 (1987). The Court noted that "such a standard is necessary if 'prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations.'" Turner, 482 U.S. at 89 (quoting Jones, 433 U.S. at 128).

**A.  Rational Relationship to Legitimate Penological Interest**

In analyzing the first Turner factor, the court must determine whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." Id. (quoting Block v.

10

Rutherford, 468 U.S. 576, 586 (1984)).  "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."  Id. at 89-90.  Further, the governmental objective must be legitimate and neutral and must operate neutrally with regard to the content of the expression.  Id. at 90.

It is undisputed that the Jail denies distribution of bulk mail for two primary reasons: (1) the precedential value of potentially having to accept other deliveries of bulk mail; and (2) the potential negative effect on the work load for the Jail staff.  Moreover, defendant contends that its current policies regarding bulk mail and general distribution of publications serves to (1) limit inmates' ability to secret contraband; (2) limit the amount of materials that inmates can use to plug toilets and flood their cells and pods; (3) limit inmates' ability to place items over the lights and windows in their cells, allowing staff to perform mandated hourly welfare checks more efficiently; and (4) enhance inmate safety by providing fewer avenues in which they can communicate inappropriate and violent messages and instructions to each other.[5]

Plaintiffs concede that defendant has an interest in maintaining mail quality control, ensuring jail security, and

---

[5] Defendant also contends that its regulations ensure compliance with California law relating to prohibitions on attorneys' and bail licensees' solicitation of business within correctional or penal facilities.  Because defendant's other asserted interests are related and, as set forth *infra*, dispositive, the court does not reach the merits of this contention.

allocating jail resources. However, plaintiffs argue that the regulations at issue are not rationally related to those legitimate interests.

The court disagrees. Defendant has presented evidence that there are over seven hundred pieces of incoming mail per day at the Jail. This requires a total of sixty people to process the mail and a total of twenty-four personnel hours per day. Under plaintiffs' calculation, distribution through bulk mail would increase incoming mail by at least two hundred fifty pieces per week.[6] Defendant presents evidence that this increase in unsolicited bulk mail would cause additional administration, staffing, and security issues for the jail. (Decl. of Capt. Scott Jones in Supp. of Mot. for Summ. J. ("Jones Decl."), filed Apr. 14, 2009, ¶ 50.) Moreover, plaintiffs concede that distribution of *CJA* is a concern because it introduces written materials for which inmates do not have an ownership interest. Plaintiff also concedes that magazines are associated with the creation of a weapon. (PUF ¶¶ 86, 88.)

Accordingly, the court finds that the undisputed facts demonstrate that defendant's regulation concerning bulk mail and drop-off distribution is logically connected to and advances the proffered legitimate penological concerns. Specifically, defendant's refusal to accept and distribute unsolicited bulk mail enables the Jail to conserve prison resources by limiting the amount of incoming mail that correctional staff must process.

---

[6] This calculation does not include any increase from other publications from different sources that may occur if defendant's policy is changed to allow this sort of distribution.

1  Further, by limiting the amount of unsolicited mail, defendant is
2  ensuring that there are less written materials that inmates may
3  easily use or dispose of in ways that are disruptive to the staff
4  or other inmates.  Finally, the regulation limits the materials
5  out of which inmates may fashion weapons.
6       The court also finds that defendant's regulation is neutral
7  in its application.  It is undisputed that the current policy
8  does not take into account the content of any unsolicited
9  publications.  (DUF ¶ 16.)
10      Plaintiffs argue that the Ninth Circuit's decision in Prison
11 Legal News v. Lehman, 397 F.3d 692 (9th Cir. 2005), relating to
12 the constitutionality of regulations relating to the receipt of
13 publications sent via bulk mail, supports their argument that the
14 regulations at issue are not rationally related to legitimate
15 interests and thus, unconstitutional.  However, the facts before
16 the court in Lehman are distinguishable from the facts before the
17 court in this case.  In Lehman, the plaintiffs challenged the
18 defendant Washington Department of Corrections' regulation
19 prohibiting the receipt of non-subscription bulk mail and
20 catalogs by inmates.  Id. at 696.  In finding that the regulation
21 was not rationally related to a legitimate penological interest,
22 the Lehman court emphasized that, in the case before it, every
23 piece of mail sent by the plaintiffs was a result of a request by
24 the recipient.  Id. at 700-01 ("[I]t is the request on the part
25 of the receiver and compliance on the part of the sender, and not
26 the payment of money, that is relevant to the First Amendment
27 analysis.").  As such, "the sender's interest in communicating
28 the ideas in the publication correspond[ed] to the recipient's

13

interest in reading what the sender has to say." Id. at 701 (internal quotations and citations omitted).  Conversely, in this case, plaintiffs do not seek to send *CJA* to inmates who have previously requested to receive the publication.  Indeed, plaintiffs have failed to disclose the name of any inmate in the Sacramento County Jail who has requested a copy of *CJA*.  (DUF ¶ 58.)  Thus, the convergence of the publisher's interest in sending and the inmate's express desire to receive, the existence of which the Ninth Circuit held was both "important" and "relevant" in this inquiry, is notably absent here.  See Lehman, 397 F.3d at 700-01.

Furthermore, two other district courts confronted with nearly identical issues are in accordance with the court's conclusion.  In both Hrdlicka v. Cogbill, No. C 04-3020, 2006 WL 2560790 (N.D. Cal. Sept. 1, 2006), and Crime, Justice & America, Inc. v. Reniff, No. 2:08-cv-343, 2009 WL 735184 (E.D. Cal. Mar. 18, 2009), plaintiffs Hrdlicka and Crime, Justice & America, Inc. brought suit challenging nearly identical regulations regarding distribution of unsolicited publications at jails in Sonoma County and at the Butte County Jail.  The defendants in Hrdlicka and Reniff proffered penological interests identical to those proffered by defendant in this case.  After reviewing the submissions of the parties and the relevant case law, the district courts concluded that the challenged prohibitions relating to unsolicited publications were rationally related to and advanced legitimate penological interests.  Further, both courts also concluded that  the Ninth Circuit's holding in Lehman

14

was inapplicable because no request for the publication had been made to plaintiffs.

Therefore, the court concludes that the first <u>Turner</u> factor weighs in favor of defendant.

**B.    Alternative Means of Exercising the Right**

In analyzing the second <u>Turner</u> factor, the court must examine whether "'other avenues' remain available for the exercise of the asserted rights." <u>Turner</u>, 482 U.S. at 90 (quoting <u>Jones</u>, 433 U.S. at 131). Where such alternative means are available, "courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" <u>Id.</u> (quoting <u>Pell v. Procunier</u>, 417 U.S. 817, 827 (1974)).

Defendant contends that inmates have always had the ability to request and receive *CJA*. Defendant also presents evidence that plaintiffs have been informed multiple times that *CJA* could be mailed directly to inmates without objection. Thus, defendant argues that other avenues remain available for inmates to receive plaintiffs' publication.

The court agrees. Defendant presents evidence that he has never refused to distribute *CJA* to an inmate that has requested it. (DUF ¶ 59.) While complying with defendant's regulation may reduce the circulation rate of *CJA*, a subscription or request based system would effectively allow plaintiffs to exercise their First Amendment right to communicate with inmates at the Sacramento County Jail. <u>See</u> <u>Jones</u>, 433 U.S. at 130-31 (holding that the loss of cost advantage in bulk mailing did not fundamentally implicate free speech values and thus, the

15

regulations imposed were reasonable); Hrdlicka, 2006 WL 2560790, at *14 (noting that traditional advertising techniques and relying on word-of-mouth to promote inmate subscribers to whom plaintiffs may directly mail issues of *CJA* was a sufficient alternative means of exercising their First Amendment right).[7]

Therefore, the court concludes that the second Turner factor weighs in favor of defendant.

**C.   Impact on the Allocation of Prison Resources**

In analyzing the third Turner factor, the court must examine the impact that accommodation of the asserted constitutional right would have on guards and other inmates as well as on the allocation of prison resources generally. Turner, 482 U.S. at 90. The Supreme Court has acknowledged that in the context of a correctional institution, "few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." Id. Where such ramifications will have a significant effect on fellow inmates or prison staff, "courts should be particularly deferential to the informed discretion of corrections officials." Id.

As mentioned above, defendants present evidence that the increase in mail created by plaintiffs' proposed distribution of an unsolicited publication would likewise increase administration, staffing, and security issues within the Jail. Defendant asserts that to accept publications or magazines from one publisher would set an unworkable precedent, obligating the

---

[7] While plaintiffs argue that defendant would be unable to distinguish between solicited and unsolicited copies, this argument is irrelevant to the determination of whether a ready alternative exists. See Reniff, 2009 WL 735184, at *2.

16

1  Jail to accept any other publications that appeared on the
2  doorstep.  (DUF ¶ 17); see Reniff, 2009 WL 735184, at *3 (holding
3  that the third Turner factor weighed in favor of defendants where
4  distribution of *CJA* would set a precedent regarding the
5  distribution of other unsolicited newsletters or publications).
6  In addition to the increased administrative burden in allocating
7  staff to sort through the additional mail, defendants also
8  present evidence that placing greater burdens on the mail
9  processing staff increases the likelihood that error will occur
10 and contraband will be missed; this would affect the safety and
11 security of the Jail as a whole.  (DUF ¶ 21); cf. Prison Legal
12 New v. Cook, 238 F.3d 1145, 1151 (holding that 15 to 30 pieces of
13 mail derived from personal subscriptions to a particular
14 publication in addition to the 5000 to 8000 pieces of first class
15 mail processed daily was minimal, particularly where there was
16 evidence that the Department was able to process improperly
17 addressed bulk mail sent by the state).
18      Therefore, in light of the undisputed evidence, the court
19 concludes that the third Turner factor weighs in favor of
20 defendant.
21 **D.   Easy or Obvious Alternatives**
22      Finally, in analyzing the fourth Turner factor, the court
23 must examine whether there are ready alternatives to the
24 regulation at issue.  Turner, 482 U.S. at 90.  "[T]he existence
25 of obvious, easy alternatives may be evidence that the regulation
26 is not reasonable, but is an 'exaggerated response' to prison
27 concerns."  Id.  However, the Supreme Court has made clear that
28

17

this factor does not impose a "least restrictive alternative test."

Plaintiffs argue that defendant's regulations are an exaggerated response because other alternatives allay some of the concerns and interests proffered by defendant. Specifically, plaintiffs point to defendant's regulations limiting the amount of possessions inmates may have in their cells. (See PUF ¶ 74.) Plaintiffs also assert that defendants could prohibit or limit an inmates' ability to leave any written materials in common areas.

The court finds plaintiffs' arguments unpersuasive. Plaintiffs' asserted alternatives fail to take into account the administrative burdens imposed upon the Jail and its staff due to an increase in unsolicited mail. Indeed, their proposed new prohibition would likely require more staffing in order to ensure that inmates did not leave unsolicited publications in common areas. Furthermore, plaintiffs fail to address the jail safety issues raised by defendant, such as the potential increase in contraband due to inadequate screening or an inmate's ability to fashion weapons or otherwise improperly use materials over which they have no ownership or personal interest.

Therefore, the court concludes that the fourth Turner factor weighs in favor of defendant.

## CONCLUSION

In sum, the court holds that defendant's regulations regarding the mail policy as it applies to unsolicited publications such as *CJA* are reasonably related to legitimate penological interests. There are valid, rational connections between the policies in place and defendant's interests in

18

maintaining mail quality control, ensuring jail security, and allocating jail resources. There are also ready alternatives for plaintiffs to exercise their First Amendment right; defendant's regulations allow for the distribution of *CJA* to inmates when it is properly addressed and mailed to those who voluntarily request it. Further, accommodating plaintiffs' request would impact the allocation prison resources through the increased burden on staff as well as the potential increase in safety issues. Finally, there is no readily apparent alternative to the current regulations that bear in mind the legitimate penological interests proffered by defendant. Accordingly, the court concludes that defendant's challenged regulations are permissible under <u>Turner</u>.

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

DATED: August 3, 2009

FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE